**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MARCIE CRANDALL and DALE FIETSAM, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL NO. 07-750-GPM |
| AT&T MOBILITY, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Plaintiffs filed this putative class action under the Class Action Fairness Act, claiming that Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act and committed common law fraud by misleading Plaintiffs to believe that their cell phones were incompatible with their new service providers after Defendant's predecessor companies merged, causing them to buy new phones unnecessarily.[1]

Defendant moves to compel arbitration under the Federal Arbitration Act (FAA) and dismiss, rather than stay, the action. There is no dispute that there is an arbitration provision in the contract

---

[1] This is the crux of Plaintiffs' misrepresentation claim. Plaintiffs claim that Defendant's predecessor company, Cingular Wireless, LLC, made false statements that misled consumers to believe that the merger with AT&T Wireless Services, Inc., would be seamless and that the consumers would be able to use their pre-existing cellular phones, despite the fact that Cingular knew that it was going to be removing vital infrastructure of the AT&T network. Plaintiffs claim that, in fact, Cingular knew but omitted to tell its customers that they could "unlock" their phones rather than buy new ones or pay additional fees.

that Plaintiffs accepted when they originally contracted for service. Later, various modifications were made to the contract through various methods, which are detailed below. But those are factual questions relating to the legal question of contract interpretation. The question that the Court struggled with during the hearing held in this matter and ever since is what role does state law play, under the FAA, in determining the validity of the arbitration provision and the contract as a whole.

The basic governing principles are simple enough and are well-established.

> Although the Federal Arbitration Act favors resolution of disputes through arbitration, its provisions are not to be construed so broadly as to include claims that were never intended for arbitration. Whether the parties have agreed to arbitrate is a question normally answered by the court rather than by an arbitrator. The issue is governed by state law principles governing contract formation. Nevertheless, [courts] must be mindful that the FAA is a congressional declaration of a liberal federal policy favoring arbitration agreements and that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.

*Continental Casualty Co. v. American Nat'l Ins. Co.*, 417 F.3d 727, 730-31 (7th Cir. 2005) (internal quotations and citations omitted). Section 2 of the FAA states: "A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court recently recognized that a recurring question under § 2 is who should decide whether "grounds … exist at law or in equity" to invalidate an arbitration agreement and reaffirmed its earlier holding that "attacks on the validity of an entire contract, as distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken." *Preston v. Ferrer*, 128 S. Ct. 978, 983-84 (2008), *citing Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).

Plaintiffs rely on the Illinois Supreme Court's decision in *Kinkel v. Cingular Wireless, LLC*,

857 N.E.2d 250 (Ill. 2006), to argue that the arbitration provision is invalid. *Kinkel* involved a customer bringing a class action against a wireless service provider (Cingular) related to early termination fees. She signed her wireless service agreement in 2001, and although it had been modified in 2003 (to the 2003 version at issue in this case), the Court held that the arbitration clause in the 2001 agreement applied because she had terminated her contract before the modification took effect; therefore, Cingular could not argue that the 2003 version was more "customer friendly." The specific issue on appeal was whether the portion of the arbitration provision barring the arbitrator from hearing class claims was unconscionable and, if so, whether that portion was severable from the remainder of the provision requiring arbitration. The Court held that in order to decide these issues, it must review what the Court called the "class action waiver" provision in the context of the service agreement as a whole and in light of the plaintiff's claims. The Court held that the 2001 service agreement contained a "degree of procedural unconscionability" because it did not inform the plaintiff that she would have to pay anything towards the cost of arbitration but, rather, informed her that she could obtain "fee information" upon request. The Court found the waiver clause substantively unconscionable, or "inordinately one-sided," and unenforceable because, when factored with the degree of procedural unconscionability, it did not provide the individual plaintiff with a cost-effective means of obtaining a complete remedy in either a judicial or arbitral forum. The Court found the waiver clause severable from the otherwise enforceable arbitration provision. Notably, the Court limited its opinion to the 2001 agreement at issue and specifically did not express an opinion on the enforceability of any revised agreements, except to say "that the enforceability of a class action waiver, whether or not the contract provides for mandatory arbitration, must be determined on a case-by-case basis, considering the totality of the circumstances. Relevant

circumstances include the fairness and balance of the contract terms, the presence of unfair surprise, and the cost of vindicating the claim relative to the amount of damages that might be awarded under the dispute resolution provision of the contract." 857 N.E.2d at 275.

Plaintiff Dale Fietsam originally subscribed to wireless service with Defendant's predecessor, AT&T Wireless Service, Inc., (AWS) in August 2003. At that time, the AWS Wireless Service Agreement, which was packaged with the phones, contained an arbitration clause. In May 2006, Plaintiff Fietsam acquired two new phones, "upgraded" his service, and entered into two new wireless service agreements. The new terms of the agreements were provided at that time. Defendant, who by December 2006 provided wireless service to AWS's customers (although still under the name of Cingular Wireless until it was renamed AT&T Mobility in January 2007), sent a copy of its revised 2006 arbitration provision with Plaintiff Fietsam's December 2006 bill. Also included on that bill and the next three bills was a notice that the arbitration provision had been updated and that it could be found on Defendant's website. Additionally, Plaintiff Fietsam opened a second wireless account with Defendant in June 2005 by acquiring two new phones. Fietsam executed his electronic signature on June 17, 2005, and in doing so he accepted the terms of service that were given to him at the time he opened this second account, including the arbitration provision. In March 2007, Fietsam obtained new phones and upgraded his service on this second account. He entered into a new wireless service agreement and executed his electronic signature on April 4, 2007. Marcie Crandall subscribed to wireless service with AWS in March 2003. The terms and conditions of her agreement with AWS, which contained an arbitration clause, were contained in a Welcome Guide that was packaged with her phone. Defendant sent all customers billed on a monthly basis a copy of the 2006 arbitration provision in December 2006. And like Fietsam,

Plaintiff Crandall's December 2006 and January through March 2007 bills contained a notice that the arbitration provision had been updated and that it could be found on Defendant's website. On or about July 31, 2007, Plaintiff Crandall entered into a new wireless service agreement when she purchased a new phone. She executed her electronic signature on July 31st, and in doing so accepted the terms of service that were given to her at that time.

Everyone agrees that there is an arbitration provision in the 2003 agreements. Plaintiffs contend that the 2003 provision is invalid under *Kinkel*; Defendants contend that the Court should consider the 2006 version, but even if it considers the 2003 version, it is valid. Plaintiffs argue that the Court should not consider the 2006 version because the misrepresentations started in 2004 – specifically, Plaintiffs were told that the merger would be seamless and they would be able to use their existing phones. Plaintiffs further argue that the 2006 version is inapplicable because Plaintiffs' most recent phone purchases were procured by fraud. But this argument is problematic for two reasons: (1) the 2006 version was sent in December 2006, and Plaintiffs did not purchase their newest phones until March (Fietsam) and July (Crandall) 2007 and (2) an attack on the contract as a whole, such as it being void because it was procured by fraud, is for the arbitrator.

In deciding whether the parties agreed to arbitrate a certain matter, federal courts generally should rely on state contract law governing the formation of contracts. *James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005). Here, the parties agree that Illinois law applies. So, first, the Court will decide which is the pertinent arbitration provision; next, whether it is enforceable. Defendant argues that the 2006 provision applies because it has a broad scope provision that encompasses all earlier claims. Plaintiffs argue that it doesn't really matter which provision the Court interprets, as both the 2003 and 2006 provisions are unconscionable under *Kinkel*.

The 2003 arbitration provision, as it has been referred to throughout, is contained in both the wireless service agreement and the welcome guide that were included with the phones that Plaintiffs purchased in 2003, and copies of these documents are attached to the Declaration of Neal Berinhout, Defendant's Associate General Counsel, Litigation, at Exhibits 10 and 16 (*see* Doc. 11). The terms and conditions are virtually the same in the two documents, although slightly different language is used in each. The Court has carefully considered both and will summarize the relevant provisions, as a verbatim recitation is not necessary. Both documents explain that they contain the terms and conditions of the agreement of the parties. Both documents set forth in bold type the heading "Resolution of Disputes," under which fall separate paragraphs designated "Binding Arbitration," "Arbitration Procedures," "Costs of Arbitration," "Waiver of Class Actions [and Jury Trials]," and "Limitations Period." The customer is instructed to read the Resolution of Disputes section carefully, as it provides for resolution of most disputes, even after termination of the agreement, through binding arbitration rather in a court by a jury or through a class action. The arbitration provision covers all disputes or claims, including those against any AWS subsidiary, parent, or affiliate companies, arising out of any aspect of the relationship between the customer and AWS, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory, except (1) the customer may take claims to small claims court if such claims qualify to be heard in that court or (2) either party chooses to pursue claims in court related solely to collection of any debts owed by the customer to AWS. Any claim or dispute must first be presented by the customer to AWS Customer Care to allow resolution of the claim. If the claim is not resolved within 60 days, the customer may request arbitration to be conducted in accordance with the American Arbitration Association under the Wireless Industry Arbitration Rules, as modified by the agreement. An

arbitrator may not order relief on a consolidated, class wide, or representative basis. The fee schedule is as follows: for claims involving less than $1,000, the customer must pay $25 and AWS will pay all other administrative costs and fees; for claims over $1,000 but under $75,000, the customer must pay his share of the arbitration fees, but no more than the equivalent of the court filing fee for an action filed in the jurisdiction of the customer's billing address; for claims over $75,000, all administrative fees and expenses will be divided equally between the parties. For all claims, each party must bear the expense of his/its own counsel, experts, witnesses, and preparation and presentation of evidence at the arbitration. The arbitration will take place in the county seat of the county where the customer is billed and will be held telephonically, should either party so request. The two documents contain almost identical waiver provisions: "By this Agreement, both you and we are waiving certain rights to litigate disputes in court. You and we both agree that any arbitration will be conducted on an individual basis and not on a consolidated, class wide or representative basis. If for any reason this arbitration clause is deemed inapplicable or invalid, or to the extent this arbitration clause allows for litigation of disputes in court, you and we both waive, to the fullest extent allowed by law, any right[s to trial by jury and] to pursue any claims on a" consolidated, class wide, or representative basis.

As an initial attack on the 2003 provision, Plaintiffs contend that it is unconscionable because Plaintiffs received it in the box with their phones. This argument fails and requires very little discussion. The Seventh Circuit Court of Appeals has stated that "[p]ractical considerations support allowing vendors to enclose the full legal terms with their products" and has held that where a consumer is given the opportunity to return a product after reading the contract included with the product, the contract is enforceable, even if the consumer never actually reads the terms. *Hill v.*

*Gateway 2000, Inc.*, 105 F.3d 1147, 1148-49 (7th Cir. 1997). Here, both Plaintiffs were informed, in the agreement and welcome guide, that "If you do not agree with the[se] Terms and Conditions, do not use the device or service and notify us immediately to cancel service."[2] Whether they read the terms is unimportant; they had the opportunity to do so before using their phones, and if they wished to reject the arbitration provision, they could have returned their phones and cancelled the service. *See Hill*, 105 F.3d at 1149 ("Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device. Competent adults are bound by such documents, read or unread."). They did not do so. The Court rejects Plaintiffs' argument that the *Hill* decision predates *Kinkel* and, therefore, should not be followed. The obvious answer is that this Court follows Seventh Circuit precedent, and the reasoning of *Hill* has not been questioned. In any event, *Kinkel* stands for no such proposition; the Illinois Supreme Court concluded that the degree of procedural unconscionability, by itself, was insufficient to render the class action waiver unenforceable. *Kinkel*, 857 N.E.2d at 266. Moreover, the Illinois Appellate Court recently examined this exact issue and, following the Seventh Circuit's rationale in *Hill*, held that although the consumer was not informed of the arbitration provision prior to or at the time she purchased satellite television service, the agreement was not so procedurally unconscionable as to be unenforceable because it provided that she was not bound by its terms until after she had read it and continued to receive the service. *Bess v. DirectTV, Inc.*, 885 N.E.2d 488,

---

[2]The language differs slightly in that Fietsam's agreement provides for notification within 30 days to cancel the service and/or return the purchased "device." Crandall's agreement provides for notification immediately to cancel service, but also includes a 15-day return policy for phones and accessories. Both agreements provide that by using the service or device, accepting a benefit for committing to the new contract terms, or paying any billed amount, Plaintiffs consent to the Terms and Conditions contained therein.

496-98 (Ill. App. Ct. 2008) (*Bess II*) (also approving format in which arbitration provision appears). Defendant's motion to include *Bess II* as supplemental authority (Doc. 25) is **granted**.

Plaintiffs' primary argument is that the "class action waiver" clause contained in the arbitration provision is unconscionable under *Kinkel* and, consequently, the entire arbitration provision is unenforceable or, alternatively, the waiver clause should be severed so that the claims can be arbitrated on a class-wide basis. Again, *Kinkel* cannot be read so broadly. The Illinois Supreme Court did not impose a *per se* rule against such clauses and specifically stated: "We do not hold that class action waivers are *per se* unconscionable. It is not unconscionable or even unethical for a business to attempt to limit its exposure to class arbitration or litigation, but to prefer to resolve the claims of customers or clients individually. Indeed, it has been suggested that, as a matter of economic theory, consumers may benefit from reduced costs if companies are allowed to engage in this strategy." 857 N.E.2d at 278. While such clauses must be reviewed on a case-by-case basis, considering the totality of the circumstances, the Court in *Kinkel* noted a pattern: "a class action waiver will not be found unconscionable if the plaintiff had a meaningful opportunity to reject the contract term or if the agreement containing the waiver is not burdened by other features limiting the ability of the plaintiff to obtain a remedy for the particular claim being asserted in a cost-effective manner." *Id*. at 274. This Court has already discussed the fact that Plaintiffs had a meaningful opportunity to reject the contract term. Of course the agreement is burdened by other features that limit Plaintiffs' ability to obtain a remedy in the most cost-effective manner, but not so much so as to render the clause unconscionable. This fact was plainly acknowledged by the Court in *Kinkel*:

> The Cingular service agreement is a contract of adhesion. The terms, including the arbitration clause and the class action waiver therein, are nonnegotiable and

> presented in fine print in language that the average consumer might not fully understand. Such contracts, however, are a fact of modern life. Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable.

857 N.E.2d at 266; *accord Hill*, 105 F.3d at 1149 ("Payment preceding the revelation of full terms is common for air transportation, insurance, and many other endeavors."). Plaintiffs here have made no showing that the expenses that they necessarily and definitely would incur would make arbitration prohibitive nor have they provided any evidence concerning the comparative expense of litigating their claims. *James*, 417 F.3d at 679-80. Rather, they seek to throw out the clause as being inherently unfair. But they must do more. "A party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs." *Id*. at 679. In *James*, the Seventh Circuit Court of Appeals specifically held that "[t]he cost differential between arbitration and litigation is evidence highly probative to [the plaintiff's] claim that requiring her to proceed through arbitration, rather than through the courts, will effectively deny her legal recourse." *Id*. at 680 (considering arbitration clause requiring resolution "individually, without resort to any form of class action" and holding that plaintiff failed to show that her expenses would make arbitration prohibitive). Plaintiffs have not shown that their inability to pursue these claims on a class-wide basis effectively denies them legal recourse, especially where small claims court remains available under the contract. *See generally James*, 417 F.3d at 680; *Kinkel*, 857 N.E.2d at 275.

As for the 2006 arbitration provision sent to customers in December 2006 and various modifications made between 2003 and 2006, this Court is unable to rule on the enforceability of those. Plaintiffs claim that starting in 2004, they were fraudulently induced to keep their phones and

service (based upon the misrepresentation that the merger would be seamless) until 2007, when they were fraudulently induced to buy new phones (based upon the misrepresentation that their current phones would not work with the network). This argument attacks the validity of Plaintiffs' agreements with Defendant starting in 2004 – therefore, whether a later version of the arbitration provision applies to this dispute is a question for the arbitrator because it depends on whether there is a valid contract at all. *See James*, 417 F.3d at 680 ("a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement but not claims that the entire contract was the product of fraud"). What is clear to this Court is that there exists a valid, enforceable arbitration clause in the agreements that Plaintiffs received with their phones in 2003. That is all this Court need decide.

And that leads to the final question: should this case be dismissed or stayed pending arbitration? The problem is that the FAA does not specifically authorize dismissal; it gives a court only the power to grant a stay. *See* 9 U.S.C. § 3; *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1172 (7th Cir. 1993). In 2000, however, the Supreme Court specifically declined to address the issue, stating: "The question whether the District Court should have [entered a stay instead of a dismissal] is not before us, and we do not address it." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 87 n.2 (2000). Thereafter, courts have been more willing to dismiss actions rather than stay them where the order compelling arbitration leaves nothing pending before the court. This Court finds that dismissal without prejudice is the appropriate course under these circumstances because Plaintiffs' claims will be determined by an arbitrator or in small claims court, and nothing is left for the Court to decide at this time. *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 679-80 (finding that district court dismissed case because there was nothing left to decide), *citing to CPR (USA) Inc. v. Spray*,

187 F.3d 245, 253 (2ᵈ Cir. 1999) (holding that "if the district court, having ordered the parties to arbitrate, has no independent substantive issue left before it – only issues relating to the validity of the arbitrator's award – then the order compelling arbitration is, effectively, a final order and an immediate appeal will be proper").  This is especially so in this case where a stay would not be appealable, *Green Tree*, 531 U.S. at 87 n.2, *citing* 9 U.S.C. § 16(b)(1), pursuit of individual relief in arbitration is questionable, and Plaintiffs may be able to pursue their claims in small claims court. There is every reason to put this case in the best position for some sort of final resolution – wherever that may be.

One final note is necessary to bring the analysis full circle regarding the interplay between federal and state law.  Courts must be "mindful of the FAA's purpose 'to reverse the longstanding judicial hostility to arbitration agreements … and to place arbitration agreements upon the same footing as other contracts.'" *Green Tree*, 531 U.S. at 89, *quoting Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  But Defendant, in making a preemption argument, would have this Court take the FAA's purpose to a higher level.  Defendant seems to argue that any finding by this Court – or disagreement with Defendants' interpretation of Illinois law – that its "pro-consumer arbitration provision" (in its words) is unconscionable would be preempted by § 2 of the FAA because such a finding would justify invalidating virtually any contract that seems unfair. Defendant distorts the principle of preemption.  The purpose of the FAA is to put arbitration agreements on *even* footing with other contracts, and any doubts concerning the scope of arbitrability are resolved in favor of arbitration.  *Green Tree*, 531 U.S. at 89; *Continental Casualty*, 417 F.3d at 731.  But this does not change the fact that state law principles govern both whether an arbitration agreement exists and whether there are defenses to the validity of such agreement.  *See Buckeye Check*

*Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). Furthermore, this case does not involve filed rates charged by a common long-distance carrier such that the Communications Act of 1934, as amended by the Telecommunications Act of 1996, would preempt Plaintiffs' challenges to the validity of the arbitration clause. *See Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002). Plaintiffs have every right to challenge the clause as unconscionable and to seek to pursue their claims as a class, but their attack on the provision fails, and now they must proceed as they agreed to do. Judge Easterbrook's statement is particularly apt and worth repeating: "Competent adults are bound by such documents, read or unread." *Hill*, 105 F.3d at 1149.[3]

For the foregoing reasons, Defendant's motion to compel arbitration and dismiss the action (Doc. 10) is **GRANTED**. This action is **DISMISSED without prejudice**, and the Clerk of Court is **directed** to close this case on the Court's docket.

**IT IS SO ORDERED.**

DATED: 07/18/2008

s/ G. Patrick Murphy
G. Patrick Murphy
United States District Judge

---

[3] Notably, Defendant includes in its papers various other service providers with whom Plaintiffs could have contracted and not been bound to arbitrate and/or waive their rights to proceed with class claims (*See* Doc. 11, Ex. D).